794 A.2d 704

**Daniel C. MAYER**

v.

**MONTGOMERY COUNTY, Maryland.**

No. 2224, Sept. Term, 2000.

Court of Special Appeals of Maryland.

March 27, 2002.

262

Carla M. Seigel (Swerdling, Paul, Leibig, Kahn & Wolly, P.C., on brief), Washington, DC, for appellant.

Richard B. Lattner, Associate County Atty. (Charles W. Thompson, Jr., County Atty. and Marc P. Hansen, Chief, Gen. Counsel, on brief), Rockville, for appellee.

Argued before SONNER, DEBORAH S. EYLER and KRAUSER, JJ.

DEBORAH S. EYLER, Judge.

In an action for judicial review, the Circuit Court for Montgomery County affirmed a decision by the Montgomery County Merit System Protection Board ("Board") denying a grievance filed by Daniel C. Mayer, the appellant, against Montgomery County, his employer and the appellee in this

case. On appeal from the ensuing judgment, the appellant presents three issues for review, which we have rephrased:

I. Did the Board err in deciding it was not improper for the appellee's Chief Administrative Officer to designate a Step III hearing officer for the appellant's grievance hearing who was a subordinate of the Step II responder for the grievance?

II. Did the Board err in deciding that the appellee had properly refused to provide the appellant certain documents he had requested?

III. Was there substantial evidence to support the Board's decision on the merits of the appellant's grievance?

For the following reasons, we answer "Yes" to the first question. Accordingly, we shall vacate the judgment of the circuit court with instructions that it vacate the decision of the Board and remand the case for a Step III hearing before a hearing officer who is not a subordinate of the Step II responder. We shall address the second question presented for guidance on remand. Because of our disposition of the first question, we do not reach the third question.

## FACTS AND PROCEEDINGS

The appellant holds the rank of sergeant in the Montgomery County Police Department. In 1997, he sought a promotion to the rank of lieutenant. His lack of success in that endeavor spawned this litigation.

The promotional examination for the rank of police lieutenant took place on September 19, 1997. It was designed jointly by the Montgomery County Office of Human Resources ("OHR") and the Montgomery County Police Department. The promotional examination worked as follows.

Applicants for the position of police lieutenant took the examination before a panel of three "raters," who were police captains and lieutenants from police departments in neighboring jurisdictions. The examination had two components: a "presentation exercise," consisting of an oral presentation and

a written essay; and a "structured oral interview," consisting of a series of oral questions and answers. Each applicant had 45 minutes to prepare for the oral presentation and 30 minutes to give it; 90 minutes to complete the written essay; 45 minutes to prepare for the oral examination; and 45 minutes to answer the oral examination questions.

The three-member panel of raters evaluated each applicant's performance on each part of the examination on the basis of seven "managerial dimensions": problem analysis, decision making, planning and organization, leadership/supervision, sensitivity, oral communication, and written communication. After observing an applicant's performance, the raters conferred and assigned the applicant a consensus raw score of between 1 and 7 on each of the seven managerial dimensions. Thus, the highest total raw score an applicant could receive was 49. The raw scores were then "adjusted" to a 1 to 100 scale.

Applicants receiving a total adjusted score of 80 or above were placed in the "well qualified" category. Those receiving a total adjusted score of 79 or lower were placed in the "qualified" category. The Montgomery County Police Department could choose any person from the highest rating category ("well qualified") to fill the position of police lieutenant. The promotion eligibility list became effective October 1, 1997, and expired on September 30, 1999.

On September 23, 1997, the appellant was notified in writing of his final promotional examination score. His total raw score was 34.5, which translated into a total adjusted score of 71. He thus was placed in the "qualified" category. Twenty-six other applicants had placed in that category as well. Eight applicants had placed in the "well qualified" category.

The scoring sheet the appellant received in the mail gave his consensus score for each of the seven managerial dimensions (which produced the 34.5 total raw score) and also gave the average, high, and low scores for all applicants on each of the seven dimensions. Also included with the documentation notifying the appellant of his examination result was a four page

"feedback sheet." The feedback sheet is a form document listing each of the seven managerial dimensions. Each applicant's feedback sheet was filled out at the end of the examination day by one of the three raters on the panel assigned to that applicant.

Under each listing on the feedback sheet, there appears a category for "areas handled well" and "areas to improve." Additional subheadings are listed under those two areas. For example, under "Problem Analysis—Areas to Improve," the subheadings listed are: consider relevant facts or information; pay attention to interrelationships or conflicts; don't jump to conclusions before properly defining problem; and avoid illogical or incomplete analysis. Next to each such subheading are spaces in which the rater filling out the feedback sheet can mark a check or other written indication that this was an area in which the applicant had a problem or performed well. There also is space under each subheading in which the rater can write comments about the applicant's performance. A memorandum that accompanied the examination results stated, however, that the feedback sheet, "[was] not intended to be all inclusive of [the applicant's] performance nor [was] it intended to provide feedback relating directly to [the applicant's] scores."

The feedback sheet for the appellant contained several checks marked off for areas to improve and areas handled well. Under the heading, "Oral Communication Areas to Improve," checks were placed next to the following four printed comments: "try to relax, show confidence when speaking before a group"; "try to be persuasive"; "keep consistent eye contact"; and "watch for distracting gestures." The rater who filled out the appellant's feedback sheet also hand wrote comments under several of the subheadings, and in the margins. One of the written comments, under "Leadership/Supervision Areas to Improve," reads: "Needs to interrelate issues. Homeless issues, Response times. Could of [sic] Done much more with officer." Another written comment, under "Written Communication Areas Handled Well," states:

"Written [sic] was pretty good—Had some mistakes of grammar."

On October 17, 1997, the appellant filed a grievance with the OHR in which he complained, *inter alia*, that the raters who evaluated him during the examination were incompetent.[1] He alleged that his feedback sheet contained grammatical errors evidencing that the raters "were not qualified to judge [him] on grammar." He further alleged that the raters "were required to evaluate candidates on 'eye contact' and 'gestures' but they never looked at [him] while [he] was speaking . . . [they] all had their heads down writing furiously." As relief, the appellant requested, *inter alia*, "immediate promotion to the rank of police lieutenant"; that he be given "a list of all professionals, along with their credentials, who have certified the instrument and process, or issued any opinion thereof"; and that he be "made whole" and be given such "other and further relief as may be requisite."

On November 5, 1997, the appellant received a written "Step II" response from Marta Brito Perez, Director of the OHR, denying his grievance. In answer to the appellant's allegation that the raters who assessed him were not competent, Perez stated, in pertinent part:

I am confident that the raters were qualified to assess your performance in all of the dimensions being tested. Each of the dimensions evaluated by this examination process were defined in Personnel Bulletin No. 441. While grammar is certainly a part of written communication, this dimension is more broadly defined as including the ability to convey ideas accurately, clearly, concisely, and in an organized manner, including the use of correct grammar, spelling, punctuation, etc. So too is eye contact but one part of oral communication, which includes not only the ability to convey ideas

---

1. Under section 6.0 of Montgomery County Administrative Procedure 4–4, which governs grievances, a grievance based on an action by the OHR, as opposed to an action by the department in which the employee works, must be submitted directly to the Director of OHR, who then furnishes a response.

verbally in an accurate, clear and concise manner, but also verbal and nonverbal communications such as gestures, eye contact, voice volume, articulation, etc. The scores that you received in each of these areas are indicative of your performance as it related to the entire definition of each dimension, not just one facet.

On November 12, 1997, the appellant appealed the denial of his grievance by asking the appellee's Chief Administrative Officer ("CAO") for a Step III hearing. The CAO then designated Human Resources Specialist Carol Rollins to conduct that hearing. Rollins works as a subordinate of Perez, who, as stated above, issued the Step II response.

The appellant lodged an objection with the CAO to his appointing Rollins as his designee for the Step III hearing. He argued that Rollins would be subject to "command influence," i.e., that she would be loath to render a decision adverse to that of her superior and therefore would not be impartial, or at least would not appear to be impartial. The appellant argued that the CAO's appointment of a Step III hearing officer who was subject to "command influence" contravened the County's stated policy, at section 3.0 of Montgomery County Administrative Procedure 4–4, to "resolve grievances ... in an environment of impartiality and mutual respect." The appellant requested that the CAO designate a hearing officer who would not be subject to "command influence."

The CAO overruled the appellant's objection and denied his request for a different hearing officer.

The Step III hearing was held on May 18 and 20, 1999.[2] The appellant participated in the hearing "under protest," noting his objection to the presiding designee. The appellant testified, as did a number of witnesses called by the appellee. Twenty-six documents were introduced into evidence.

---

2. By agreement of the parties, the Step III hearing was delayed pending the outcome of an unrelated grievance by the appellant.

On August 10, 1999, James E. Torgesen, Labor/Employee Relations Manager for the OHR, furnished the parties proposed "Findings of Fact," and gave them an opportunity to submit comments.[3]  They did so, and their comments were incorporated into the final Grievance Decision, which was prepared by Torgesen, based on Rollins's findings, and was adopted and signed by the CAO on December 30, 1999.  The Grievance Decision, which is 22 pages long, sets forth findings of fact, arguments of the parties, conclusions, and a disposition denying the appellant's grievance.

The appellant took a timely appeal to the Board.  The parties filed written submissions, which the Board reviewed, together with the Step III Grievance Decision and the documents introduced into evidence at the Step III hearing.  Neither party timely requested a hearing and the Board did not hold one.

On April 26, 2000, the Board issued a written decision denying the appeal.  The Board concluded, *inter alia*, that the CAO had not acted contrary to the governing county laws, regulations, or procedures in designating a Step III hearing officer who was a subordinate of the Step II responder. Specifically, the Board ruled that "[t]he use of an OHR staff member to conduct the Step 3 fact-finding portion of the grievance was not improper" and the appellee did not deny the appellant the rights due to him under the merit system law by having the Step III hearing conducted by a subordinate of the Step II responder.  The Board characterized its review of the appellant's grievance as "de novo," and suggested that any potential for bias due to "command influence" was eliminated by the nature of the Board's review.  The Board added, inconsistently with that suggestion, that it is authorized to

---

3.  Although Torgesen furnished the proposed findings to the parties, he did not make the findings; they were made by Rollins.  In addition, notwithstanding some erroneous references in the record to Torgesen being the Step III hearing officer, Rollins in fact served that function. Even if Torgesen had served as the hearing officer, that would not have affected the first issue in this case, as he, like Rollins, was a subordinate of Marta Brito Perez.

hold an evidentiary hearing in a grievance appeal when there are genuine disputes of material fact, but that the appellant's grievance only involved an issue of law, and therefore an evidentiary hearing was not called for. It also pointed out that the appellant had not requested an evidentiary hearing in any event.

On the merits of the grievance, the Board ruled that the promotional examination as given did not violate any county law or regulation, and was not otherwise improper.

The appellant brought an action for judicial review of the Board's decision, in the Circuit Court for Montgomery County. The appellee participated, and both parties submitted memoranda of law to the court. The court held a hearing and thereafter affirmed the Board's decision.

The appellant noted a timely appeal to this Court.

We shall provide additional facts as necessary to our discussion of the issues.

## STANDARD OF REVIEW

In *Ahalt v. Montgomery County,* 113 Md.App. 14, 686 A.2d 683 (1996), we explained the standard of appellate review of administrative agency decisions:

Our role in reviewing an administrative decision is "precisely the same as that of the circuit court." *Dep't of Health & Mental Hygiene v. Shrieves,* 100 Md.App. 283, 303–04, 641 A.2d 899[ ] (1994); see *Moseman v. County Council,* 99 Md.App. 258, 262, 636 A.2d 499,[ ] cert. denied, 335 Md. 229, 643 A.2d 383 (1994). Like the circuit court, we must review the administrative decision itself. *Public Serv. Comm'n v. Baltimore Gas & Elec. Co.,* 273 Md. 357, 362, 329 A.2d 691[ ] (1974); see *Dep't of Econ. & Employment Dev. v. Hager,* 96 Md.App. 362, 625 A.2d 342[ ] (1993).

"Judicial review of administrative agency action is narrow." *United Parcel Serv. v. People's Counsel for Baltimore County,* 336 Md. 569, 576, 650 A.2d 226[ ](1994). In reviewing the Board's decision, this Court must not engage in judicial fact finding. *Anderson v. Dep't of Pub. Safety,* 330 Md. 187, 212, 623 A.2d 198[ ] (1993); *Board of County*

*Comm'rs v. Holbrook,* 314 Md. 210, 218, 550 A.2d 664[ ] (1988). Nor may we supply factual findings that were not made by the Board. *Ocean Hideaway Condo. Ass'n v. Boardwalk Plaza Venture,* 68 Md.App. 650, 515 A.2d 485[ ] (1986). Moreover, this Court may not uphold the agency's decision "unless it is sustainable on the agency's findings and for the reasons stated by the agency." *United Parcel Serv.,* 336 Md. at 577, 650 A.2d 226 (quoting *United Steelworkers v. Beth. Steel,* 298 Md. 665, 472 A.2d 62[ ] (1984)); see *Harford County v. Preston,* 322 Md. 493, 505, 588 A.2d 772[ ] (1991).

*Id.* at 20–21, 686 A.2d 683.

In contrast to the deferential review accorded to an agency's factual findings, questions of law receive no deference on review; we are not bound by the agency's interpretation of law. *Caucus Distributors v. Maryland Sec. Comm'r,* 320 Md. 313, 324, 577 A.2d 783[ ] (1990); *State Admin. Bd. of Election Laws v. Billhimer,* 314 Md. 46, 59, 548 A.2d 819[ ] (1988), cert. denied, 490 U.S. 1007, 109 S.Ct. 1644, 104 L.Ed.2d 159 (1989). Indeed, "a reviewing court is under no constraints in reversing an administrative decision which is premised solely upon an erroneous conclusion of law." *People's Counsel for Baltimore County v. Maryland Marine Mfg. Co., Inc.,* 316 Md. 491, 497, 560 A.2d 32[ ] (1989).... To the contrary, the reviewing court "must substitute its judgment for that of the agency if ... [its] interpretation of the applicable legal principles is different from that of the agency." *Perini Services, Inc. v. Maryland Health Resources Planning Comm'n,* 67 Md.App. 189, 201, 506 A.2d 1207,[ ] cert. denied, 307 Md. 261, 513 A.2d 314 (1986).

*Carriage Hill v. Md. Health Resources Planning Com'n,* 125 Md.App. 183, 213–14, 724 A.2d 745 (1999).

## DISCUSSION

### I.

Pursuant to section 401 of the Montgomery County Charter, the Montgomery County Council has enacted legislation estab-

lishing a merit system for all officers and employees of the county government, with certain exceptions not applicable here. Montgomery County Code, § 33–3(a) (1994, Nov. 1997 Supp.) ("Code"). The merit system is administered by the CAO, under the direction of the county executive, and is governed by and subject to applicable provisions of the Montgomery County Charter, Chapter 33 of the Code, and the personnel regulations adopted by the county executive. Code, § 33–3(b).

The Montgomery County Council's statement of legislative intent for the merit system law provides:

It is the legislative intent of the county council that this article foster excellence in the public service; high individual competence among employees; recognition that respect for the employee as an individual is first required for achieving such excellence and competence; and harmonious and efficient operation within the various components of county government.

Code § 33–5(b) states, at subsections (2), (6), and (8):

The recruitment, selection and advancement of merit system employees shall be on the basis of their relative abilities, knowledge and skills, including the full and open consideration of qualified applicants for initial appointment.

\* \* \*

All applicants to and employees of the county merit system shall be assured fair treatment without regard to political affiliation or other nonmerit factors in all aspects of personnel administration.

\* \* \*

The merit system established under this chapter shall be interpreted in accordance with these principles.

Code § 33–12(b) governs grievance procedures. It directs the county executive to prescribe personnel regulations adopting "procedures which seek to secure at the lowest possible level a fair, prompt and mutually satisfactory resolution to a grievance." The procedures "shall ensure that any grievance based upon an alleged improper application of a merit system law or regulation concerning a disputed issue of fact is entitled

to resolution after a fact-finding inquiry authorized by the [B]oard."

The Montgomery County Personnel Regulations ("MCPR"), as adopted by the county executive, define "Due Process" as "[t]he right of a County employee to be afforded those procedural and substantive protections established by applicable provisions of the Charter, merit system law, regulations or administrative procedures in any matter affecting terms or conditions of employment." MCPR, 3.2.

Grievances are addressed in section 29 of the MCPR. A grievance may be filed, *inter alia,* for an alleged "[i]mproper, inequitable or unfair act in the administration of the merit system, which may include promotional opportunities...." MCPR 29–2(c). Under MCPR 29–3, the CAO is directed to establish a procedure for reviewing and processing grievances. The procedure is to "assure prompt, objective, and impartial resolution at the lowest level of supervision possible." MCPR 29–3.

Administrative Procedure 4–4, entitled "Grievances," was adopted by the CAO pursuant to the regulations quoted above. It provides, at section 3.0:

> It is County policy to resolve grievances in an orderly and timely manner in an environment of impartiality and mutual respect, with the objective of resolving job-related problems in order to encourage excellence of work and improved level of service.

The appellant contends that the Board was legally incorrect in concluding that the fairness requirements of the applicable Montgomery County personnel laws and procedures were satisfied in his grievance when his CAO-designated Step III hearing officer was a subordinate of the Step II responder. He argues, as he did below, that a hearing officer who is subject to "command influence" either does not act impartially or does not appear to be acting impartially; and, in either circumstance, the employee/grievant does not receive fair treatment.

In support of his "command influence" argument, the appellant cites *West Virginia v. Kelly,* 145 W.Va. 70, 112 S.E.2d 641

(1960). In that case, the West Virginia Department of Motor Vehicles revoked a used car dealer's business license on the ground of record-keeping violations. The used car dealer was charged with the violations as a result of an investigation by the commissioner of the Department of Motor Vehicles. A revocation hearing was held and was presided over by one of the commissioner's deputies. The commissioner appeared and testified about the findings of his investigation. The used car dealer gave contrary testimony. The deputy commissioner chose to believe his superior over the used car dealer, and ruled to revoke the dealer's license.

On appeal, the used car dealer argued that having the deputy commissioner serve as the fact-finder and decision-maker in a hearing in which his superior's investigation and findings were at issue created "command influence" that undermined his due process rights to a fair and impartial hearing. The Supreme Court of West Virginia agreed. It noted that due process

> requires that a trial or hearing ... be fair, unbiased and by an impartial tribunal, whether the tribunal be administrative or judicial, and that the power exercised by the tribunal ... not be exercised in an arbitrary or capricious manner.

*Id.* at 74, 112 S.E.2d 641. The court then stated:

> In *Tumey v. State of Ohio*, 273 U.S. 510, 47 S.Ct. 437, 444, 71 L.Ed. 749[ ] (1927), Mr. Chief Justice Taft ... stated: "Every procedure which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the State and the accused, denies the latter due process of law."
>
> * * *
>
> [Therefore], remembering the history giving rise to the adoption of the due process provisions, and keeping in mind the freedoms assured the people thereby, we are of the view that the record discloses that [the used car dealer] has been denied due process of law and that, for that reason, the order should be set aside and the writ prayed for awarded.

It can hardly be contended that the commissioner, in the making of the investigation and in testifying before the deputy commissioner appointed by him and responsible to him, beyond any reasonable probability, did not become biased and prejudiced in the matter being heard. It would seem to be beyond human experience and expectation for impartiality to result where the officer is investigator, prosecutor, witness and trier of facts. It would seem clear, in these circumstances, that the deputy commissioner could not have acted with impartiality in the consideration of [the used car dealer's] rights. His actions were for the commissioner, and could not be expected to be free and independent of his influence. Such procedure would most certainly "offer a possible temptation to the average man to forget the burden of proof." This, of course, is not to intimate that the commissioner or deputy commissioner acted with any evil intention or design. But denial of due process, within the meaning of the law, is of itself arbitrary and capricious action, though the officer or tribunal may have acted with the most worthy intentions.

*Id.* at 75–76, 112 S.E.2d 641.

The appellant also points out that the General Assembly recognized the unfairness of "command influence" when it enacted legislation creating the Office of Administrative Hearings. As the Court of Appeals explained in *Anderson v. Department of Public Safety and Correctional Services,* 330 Md. 187, 623 A.2d 198 (1993):

One of the main objectives of the Legislature in establishing the OAH was to provide an impartial hearing officer in contested cases. A hearing officer employed by and under the control of the agency where the contested case or other disputed action arises, often results in the appearance of inherent unfairness or bias against the aggrieved. See the Final Report of the "Governor's Task Force on Administrative Hearing Officers." (1988).

*Id.* at 213–14, 623 A.2d 198.

The appellee's response to the appellant's "command influence" argument is three-fold. First, it argues that, just as

administrative proceedings in which agencies serve both pros-ecutorial and adjudicatory roles have been held not to violate due process, the designation in this case of a Step III hearing officer subordinate to the Step II responder did not violate due process.

Second, it argues that the appellant's position "ignores the purpose and reality of an internal grievance review process," which, it asserts, is not a substitute for the quasi-judicial review afforded by the Board, but is a preliminary internal dispute resolution mechanism designed to promptly resolve grievances at the lowest possible level. If that objective is not attained, the employee's grievance is decided by the Board, in what the appellee terms a "de novo review." Thus, any impartiality or appearance of impartiality due to "command influence" is a necessary by-product of the process and in the final analysis does not matter, because the Board determines the grievance anew.

Finally, the appellee argues in the alternative that by failing to request a hearing before the Board, and not challenging the written record with disputed facts, the appellant deprived himself of the sort of evidentiary hearing that would have cured any procedural unfairness resulting from "command influence" at the Step III hearing, and thus waived the issue for review.

The grievance procedure as described in MCPR 29–3 re-quires that there be "levels of review," otherwise designated as "steps," and that there be a "[w]ritten decision or disposi-tion at each level of review." MCPR 29–3(c). The "steps" in the formal grievance procedure as set forth in section 6.1 *et seq.* of Administrative Procedure 4–4, adopted by the CAO, include a single opportunity, at the Step III hearing, for the grievant and the department against which the grievance is lodged to present and respond to the grievance by, *inter alia,* calling witnesses and furnishing documents. Administrative Procedure 4–4, section 6.4. Thus, the Step III hearing officer presides over the only internal grievance hearing at which the parties may present evidence. The hearing officer makes

findings of fact based in part on credibility assessments of the witnesses and reaches a conclusion about the merits of the grievance. The hearing officer's factual findings and conclusion either will be consistent with or will reject the already stated findings and conclusion of the Step II responder.

We agree with the appellant that when, in such a process, the Step III hearing officer is a subordinate of the Step II responder, there is a substantial likelihood that the hearing officer's view of the case will be tainted and that he therefore will not render an impartial decision; and even if there is no actual partiality, the process appears not to be impartial. A grievant in the appellant's position reasonably would think that the Step III hearing officer's interest in pleasing his superior, the Step II responder, by resolving the grievance as the Step II responder did, would interfere with his ability to make a neutral decision. In either case, the process is not "fair," as required by the governing statute, regulations, and rules.

The appellee does not argue directly that when the Step III hearing officer for a grievance is a subordinate of the Step II responder, there is not at least an appearance of impartiality in the process. Rather, the appellee attempts to analogize the process used here to processes in which members of a single agency serve both prosecutorial and quasi-judicial functions, without principles of due process being offended. We do not find this argument persuasive.

The appellee quotes a general statement by the Court of Appeals in *Montgomery County v. Stevens*, 337 Md. 471, 654 A.2d 877 (1995), that:

It is ... very typical for the members of administrative agencies to receive the results of investigations, to approve the filing of charges or formal complaints instituting enforcement proceedings, and then to participate in the ensuing hearings. This mode of procedure does not violate the Administrative Procedure Act, and it does not violate due process of law.

*Id.* at 485, 654 A.2d 877 (quoting *Withrow v. Larkin,* 421 U.S. 35, 55–56, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975)). The *Stevens* case involved a complaint against a police officer that was initiated by the Chief of Police after he was told about the officer's misconduct by a lawyer who witnessed it. The case did not concern an internal complaint or grievance process in which members of an agency were passing judgment on their superiors' fact-finding and decision-making.

The appellee next cites *Consumer Protection Div. Office of the Attorney Gen. v. Consumer Publ'g Co., Inc.,* 304 Md. 731, 501 A.2d 48 (1985), in which the Court held that it was not a violation of due process of law when the Consumer Protection Division of the Attorney General's Office investigated a business's advertising practices, filed charges based on the investigation, and held hearings to determine whether the business had violated the Consumer Protection Act. The Court pointed out that the mere fact that both the prosecutorial and adjudicatory functions occurred within the Attorney General's Office was not a due process violation and, in fact, those in the Attorney General's Office who participated in the investigation and filing of charges did not participate in the adjudicatory phase of the case. 304 Md. at 763, 501 A.2d 48. In the case *sub judice,* by contrast, within a single agency, a subordinate was called upon to pass judgment on the correctness *vel non* of his superior's decision resolving a grievance.

Finally, the appellee cites *Marcello v. Bonds,* 349 U.S. 302, 75 S.Ct. 757, 99 L.Ed. 1107, *reh'g denied,* 350 U.S. 856, 76 S.Ct. 38, 100 L.Ed. 761 (1955), for the general proposition that the type of "command influence" present in the process in the case at bar has been held by the Supreme Court not to violate due process of law.

In that case, the petitioner was ordered deported after a hearing was held pursuant to the Immigration and Nationality Act of 1952. He did not challenge the ground for deportation (his conviction of a crime) but claimed, *inter alia,* that the deportation proceeding violated due process. Specifically, he argued that his hearing was not fair and impartial because the

"special inquiry officer" who presided over it "was subject to the supervision and control of officials in the Immigration Service charged with investigative and prosecuting functions." 349 U.S. at 311, 75 S.Ct. 757. The Supreme Court rejected that contention, stating:

> Petitioner would have us hold that the presence of this relationship so strips the hearing of fairness and impartiality as to make the procedure violative of due process. The contention is without substance when considered against the long-standing practice in deportation proceedings, judicially approved in numerous decisions in the federal courts, and against the special considerations applicable to deportation which the Congress may take into account in exercising its particularly broad discretion in immigration matters.

*Id.*

The Supreme Court's holding in *Marcello v. Bonds* is hardly the broad rejection of "command influence" as a ground for unfairness in an administrative hearing process that the appellee reads it to be. The Court explained that the process at issue, that is, the use of special inquiry officers who were underlings of Immigration Service officials charged with enforcement, had been fashioned by Congress in an area over which it has exceptionally wide control. Moreover, while the special inquiry officer who presided over the deportation hearing in that case was subject to supervision by officers on the enforcement side of the Immigration Service, he was not charged with reviewing factual findings and conclusions made by them.

■ The same distinction is present in all the cases cited by the appellee, and is the reason why its attempt to analogize cases in which courts have approved adjudicatory decisions within agencies also serving enforcement roles to cases in which an agency decision-maker is charged with re-making a decision of his immediate supervisor fails. Especially when adjudicatory and enforcement functions of an agency are separately handled, the fact that one arm of an agency prosecutes a claim and another arm decides its validity is not

essentially unfair. Prosecution and adjudication are distinct functions. In the case at bar, by contrast, the Step II responder and the Step III hearing officer engaged in nearly an identical adjudicatory-type function. In that situation, in which the second decision-maker is literally "second guessing" the decision of the first decision-maker, who is his superior, the process appears destined for a particular result from the start.

We also disagree with the appellee's second and third arguments, which are interrelated: That any unfairness in the process on account of "command influence" was cured by the Board's "de novo" hearing and, alternatively (and as we shall explain inconsistently), because any such unfairness could have been cured by an evidentiary hearing before the Board, the appellant waived his right to complain by not requesting such a hearing.

Section 30 of the MCPR governs "Appeals and Hearings," including an appeal to the Board to review an administrative decision on a grievance. Under MCPR § 30–2, when an employee appeals to the Board in a grievance case,

> after development of a written record, [the] appeal must be reviewed [by the Board] and a hearing *may* be granted ... at the discretion of the [Board] if it is believed that the record is incomplete or inconsistent and requires oral testimony to clarify the issues. If the Board denies the request for hearing, a decision on the appeal must be rendered based on the written record.

(Emphasis added.) MCPR 30–10 authorizes the Board to conduct a "quasi-judicial" hearing in which it may, *inter alia,* administer oaths, subpoena witnesses and documents, receive or refuse evidence, and "take any action necessary to a fair disposition of the case." The regulations also provide for certain prehearing discovery, at the discretion of the Board, *see* MCPR 30–15, and govern the presentation of testimony by witnesses before the Board, *see* MCPR 30–14.

The appellee asserts that in this case the Board "engaged in a *de novo* review of [the appellant's] grievance

based upon the written record developed before" the Board. The record makes plain, however, that the Board did not conduct a de novo hearing, and did not decide the appellant's grievance "de novo." A de novo proceeding is one that starts fresh, on a clean slate, without regard to prior proceedings and determinations. "A true trial de novo ... puts all parties back at 'square one' to begin again just as if the adjudication appealed from had never occurred." *General Motors v. Bark,* 79 Md.App. 68, 79, 555 A.2d 542 (1989). In *Boehm v. Anne Arundel County,* 54 Md.App. 497, 459 A.2d 590 (1983), we explained what constitutes a de novo hearing:

> A trial or hearing "de novo" means trying the matter anew the same as if it had not been heard before and as if no decision had been previously rendered. Thus, it is said that where a statute provides that an appeal shall be heard de novo such a hearing is in no sense a review of the hearing previously held. . . .
>
>     \* \* \*
>
> A trial de novo or a de novo hearing of the matter under "review" may be new and different from the trial or hearing before the administrative agency in respect of one or more, or all, of the following: evidence heard or facts considered, especially where the administrative agency did not afford a hearing; issues raised; findings made; grounds for decision; and the view of the evidence heard or facts considered, the opinion as to the preponderance of the evidence, and the proper judgment to be reached or action to be taken in accordance with the evidence or facts as thus viewed. The last element would appear to be the essential element of a true trial or hearing de novo and may be embraced by general statements of a court that a trial de novo is involved.

*Id.* at 509–11, 459 A.2d 590 (quoting 2 Am.Jur.2d Administrative Law § 698 (1962)). *See also Halle Cos. v. Crofton Civic Ass'n,* 339 Md. 131, 144, 661 A.2d 682 (1995); *Pollard's Towing, Inc. v. Berman's Body Frame & Mech., Inc.,* 137 Md.App. 277, 288, 768 A.2d 131 (2001); *Maryland Racing Comm'n v. Belotti,* 130 Md.App. 23, 53, 744 A.2d 558 (1999).

Because a de novo hearing "is in actuality the first formal hearing on the issue[, it] purges any potential errors from the earlier decision...." *Boehm v. Anne Arundel County,* 54 Md.App. at 511, 459 A.2d 590. Thus, "an individual is provided due process of law even if he or she is not given notice of or a hearing at the initial administrative levels when he or she is afforded a *de novo* hearing at the [Merit System Protection Board]." *Hill v. Baltimore Co.,* 86 Md.App. 642, 655, 587 A.2d 1155 (1991).

In the case at bar, the Board did not conduct an evidentiary hearing. Instead, it took into consideration the findings of fact made by the Step III hearing officer and adopted by the CAO. Indeed, it noted that the Step III hearing was "held ... to determine the facts relevant to the issues in the grievance." After observing that the parties were permitted to respond to the Step III hearing officer's proposed factual findings, and that their responses were incorporated into the CAO's decision, the Board stated, erroneously, that the CAO's decision "included the *agreed-upon findings of fact,* conclusions, and disposition." (Emphasis added.)

While many of the facts pertaining to the appellant's grievance were not disputed, the parties did not agree about all of them, including certain material facts that only could be determined by a demeanor-based credibility assessment of the witnesses. For example, the appellant contended that the raters did not look at him during his presentation; those in charge of administering the promotional examination contended to the contrary. Based on witness testimony and other evidence, the Step III hearing officer decided that factual dispute contrary to the appellant. The CAO adopted that finding, and the Board considered it in its review.

Thus, the Board did not conduct a de novo hearing or review; it did not start from scratch, and determine the facts for itself, based on first-hand evidence presented to it. The Board's observation that its decision on review was de novo because it considered the fact-finding of the Step III hearing officer among other items submitted to it, and that the appel-

lant was free to "submit statements of fact, arguments, and exhibits" for the Board's further consideration, evidences a fundamental misunderstanding of what constitutes a de novo decision. Simply put, the Board did not render a de novo decision in this case.

■ If the Board truly had conducted a de novo review of the appellant's grievance, by holding an evidentiary hearing and itself making the credibility assessments that go into findings on disputed issues, the CAO's error in appointing a Step III hearing officer subject to "command influence" would have been cured. The Board did not conduct a de novo review, however. Moreover, we find no merit in the appellee's contention that because the appellant could have requested an evidentiary hearing before the Board that, if held, would have cured the CAO's error, he is precluded from arguing that the Board erred, as a matter of law, in ruling that the CAO's selection of a Step III hearing officer comported with the governing local laws and procedures.

The "command influence" question posed by the appellant in his appeal to the Board was a question of law. The Board answered the question incorrectly, concluding that the internal nature of the grievance procedure made the appearance of impartiality on the part of the Step III hearing officer acceptable and further concluding that any real or apparent partiality due to "command influence" was wiped clean by the Board's de novo review, in any event. The Board was wrong on both scores—the CAO's appointment was contrary to the governing laws and the Board's review was not de novo, and therefore did not cure the error.

The Board should have properly decided the question and then should have disposed of the appeal, on that basis, by remanding the matter to the CAO for a new Step III hearing before a hearing officer not subject to "command influence." In other words, the appellant was entitled to receive what the CAO's improper appointment of Rollins as the Step III hearing officer did not give him: a Step III hearing conducted by a hearing officer who was impartial and did not appear other-

wise. The fact that the CAO's error would have been cured by an evidentiary hearing before the Board, thereby rendering the legal issue moot, did not mean the appellant was *required* to seek an evidentiary hearing. At his option, he was entitled to present the legal question to the Board, have it properly decided, and have his grievance remanded for a new Step III hearing.[4]

## II.

We shall address the second question the appellant raises for guidance on remand.

In his grievance, the appellant included in his request for relief the following:

1. That all candidates, including [the appellant] be afforded "an opportunity to review examinations and scores.["]

2. That [the appellant] be provided a copy of all documents establishing that this was a professionally accepted test instrument, including any validation studies.

3. That [the appellant] be provided a list of all professionals, along with their credentials, who have certified the instrument and process, or issued any opinion thereof.

In her November 5, 1997 response, Marta Brito Perez stated:

Under the Maryland [Public Information Act] Section 10–618 [of Md.Code (1984, 1995 Repl.Vol.), State Government Article ("SG")], Permissible Denials, a custodian of records may deny inspection of test questions, scoring keys, and other examination information. However, an individual who takes a promotional examination must be permitted to review their written examination. Ms. Deborah Langford of this Office offered you an opportunity to review your exami-

---

4. We note, moreover, that the Board's decision makes plain that had the appellant timely requested an evidentiary hearing, the request would have been denied. As we have explained, the Board incorrectly assessed the appellant's grievance as one in which there was no genuine dispute of material fact, and therefore not warranting an evidentiary hearing.

nation, but you declined. Had you done so, you might better understand the ratings that you received. All other examination materials are considered confidential and will not be released. I realize that a detailed discussion with the raters on your panel might provide you with the type of one-on-one feedback you are seeking. However, we were not able to retain the raters for a period of time sufficient to provide such in depth feedback to all candidates.

In an October 23, 1998 letter, the appellant renewed his request that he be provided "the requested material including, but not limited to, raters' instructions, review, and comments, as well as the actual test document."

On January 12, 1999, the appellee responded by letter. That letter gives the clearest description of the materials that were requested, and the appellee's decision about which materials to provide. The letter, written by Anne T. Windle, Assistant County Attorney for OHR, states:

> *To reiterate our position, it is that Section 4.4 of [Administrative Procedure] 4–4 does not require us to release certain promotional exam test materials since it has been the County's long-standing policy not to release materials which would either compromise the integrity of future exams or give candidates an unfair advantage in future exams.* Therefore, we are releasing the following materials from the 1997 Lieutenant exam training manual since their release neither compromises the integrity of future exams, nor gives candidates an unfair advantage in future exams.

Section 1.   Overview

  Training Outline

  List of Assessors

Section 2.   Job Information

  Class Specification for Police Sergeant

Section 3.   How to Assess

  Dimensions for Evaluation

  Behavior Dimensions and the 4 Steps to Assessing Behavior

Where Dimensions Expected to Occur

Behavioral Example Exercise

Dimension Classification Exercise

Rating Errors

General Guidelines

\* \* \*

Section 7.   Consensus

Individual Rater Worksheet

Consensus Process Description

Consensus Form

Feedback Sheet

Dimension Scales, Problem Analysis — Written Communication

Section 8.   Administration

Schedule for Exam

Promotional Exam Schedule [candidates names redacted]

Promotional Process Administration

Promotional Process Form for Administration

(Emphasis added.)   The appellee also furnished the appellant the "Rater Disclosure Form" for the promotional examination and the "Promotional Process Security Order."   The appellee detailed the following materials it was *not* providing

Section 4.   Oral Presentation

General Information Sheet

Information Sheet for Presentation Exercise

Letters and Data Given to Candidate as Background

Guidelines for Evaluation

Section 5.   Written Examination

Instructions for Written Report

Data Given to Candidate as Background Guidelines

Section 6.   Interview

General Information Sheet

Oral Exam Questions

Rater Script for Oral Exam Questions

Oral Exam Questions with Preferred Responses.

The appellee also declined to provide the rater's notes and raters' rating forms, on the ground of protecting the integrity of future examinations and because the raters had been assured in writing that their notes and comments on those forms would be kept confidential.

Section 4.4 of Administrative Procedure 4–4, referenced by Windle in her January 12, 1999 letter, states:

Each person who is responsible for presenting or responding to a grievance, or who holds information pertinent to the resolution of the grievance, must provide full disclosure of evidence relating to the grievance, provided that such disclosure is not precluded by law, policy, or procedure.

At the Step III hearing, Windle was called to testify by the appellee. Windle reviewed the contents of her January 12, 1999 letter and explained that the raters' notes and the raters' ratings forms were denied on the ground that disclosure would compromise future examinations and give certain candidates an unfair advantage in those examinations, and because the raters had been promised confidentiality. She further explained, as her letter stated, that it was the appellee's long-standing policy not to disclose examination materials of the sort requested and to assure confidentiality to raters, so they would make candid assessments of the candidates.

Windle's testimony was not contested. The Step III hearing officer found that the appellant was not entitled to the materials the appellee had declined to release. The CAO's Grievance Decision adopted the hearing officer's findings and concluded, *inter alia,* that "[t]he interests of the County should be protected in this instance by the long-standing policy and consistent practice of denying similar requests."

On review, the Board concluded, as a matter of law, that notwithstanding section 4.4 of Administrative Procedure 4–4, the appellee had discretion under the Maryland Public Information Act, SG § 10–618(c)(1), to deny the appellant's request for test materials, including the raters' notes and raters' rating forms; and the appellee was justified in exercising its

discretion to deny the appellant's request to inspect those materials.

SG § 10–618, titled "Permissible Denials," provides:

(a) *In general.*—Unless otherwise provided by law, if a custodian believes that inspection of a part of a public record by the applicant would be contrary to the public interest, the custodian may deny inspection by the applicant of that part, as provided in this section.

\* \* \*

(c) *Examinations.*—(1) Subject to paragraph (2) of this subsection, a custodian may deny inspection of test questions, scoring keys, and other examination information that relates to the administration of licenses, employment, or academic matters.

(2) After a written promotional examination has been given and graded, a custodian shall permit a person in interest to inspect the examination and the results of the examination, but may not permit the person in interest to copy or otherwise to reproduce the examination.

A "person in interest" includes, *inter alia,* a person that is the subject of a public record. SG § 10–611(e). A "public record" means "the original or any copy of any documentary material that: (1) is made by a unit of instrumentality of the State government or of a political subdivision or received by the unit or instrumentality in connection with the transaction of public business...." SG § 10–611(g)(1).

The appellant argues, as he did before the Board, that any documents used or created by the raters in administering and grading the promotional examination reflect their competency and therefore are relevant and material to his grievance. While conceding that "[t]here is no broad constitutional right to pre-hearing discovery in administrative proceedings[, and that] any general right to such discovery must come from statutes or rules governing those proceedings," he argues that under section 4.4 of Administrative Procedure 4–4, he has an absolute right to receive the documents the appellee declined to release, and that section 4.4 eliminated whatever discretion

the appellee had under SG § 10–618(c)(1) to "deny inspection of test questions, scoring keys, and other examination information that relates to . . . employment . . . matters." The appellee responds that the Board properly ruled that section 4.4 of Administrative Procedure 4–4 did not affect its discretion to deny inspection of the requested documents, under SG § 10–618(c)(1) and that it properly exercised that discretion.

■ The documents the appellant requested and the appellee declined to provide are portions of the raters' training manual containing test questions and suggested answers, or material containing actual test questions and recommended answers, and the notes and forms made and filled out by the raters in assessing the performance of other individuals who took the promotional examination. (The appellant was afforded the opportunity to inspect his own examination materials.) Plainly, the documents at issue are examination materials under SG § 10–618(c)(1), that is, "test questions, scoring keys, and other examination information that relates to . . . employment matters[,]" that are subject to discretionary denial by the appellee. We disagree with the appellant that section 4.4 of Administrative Procedure 4–4 removed the appellee's statutorily granted discretion to deny inspection of the requested documents.

■ The appellant maintains that the plain language of section 4.4 of Administrative Procedure 4–4 directing a person responsible for "presenting or responding to a grievance," or in possession of information pertinent to its resolution, to "provide full disclosure of evidence relating to the grievance, provided that such disclosure is not precluded by law, policy, or procedure[,]" means that all relevant evidence must be furnished unless the person in question is *prohibited* by law from doing so. Accordingly, because neither SG § 10–618(c)(1) nor any other "law, policy, or procedure" *prohibits* the appellee from producing the examination materials at issue, the Board incorrectly concluded that the appellee acted properly in declining to provide the materials.

As we have explained, Administrative Procedure 4–4 is the procedure for grievances that was adopted by the CAO, pursuant to the county executive's discretion that the CAO do so, in MCPR 29–3. In interpreting the meaning of section 4.4 of Administrative Procedure 4–4, we look not only to the literal meaning of its words but also to their meaning in light of the objective of the administrative rules of which it is a part and in the context of the regulation authorizing its adoption. *See Mayor & City Council of Balt. v. Chase*, 360 Md. 121, 129, 756 A.2d 987 (2000); *Morris v. Prince George's County*, 319 Md. 597, 604, 573 A.2d 1346 (1990); *Warfield v. State*, 315 Md. 474, 499, 554 A.2d 1238 (1989).

Section 4.4 does not address prehearing production of documents. It is entitled "Disclosure of Facts." Its very general language is merely an exhortation to those people pursuing and defending the grievance, and those having some knowledge about it, to provide full disclosure of "evidence" related to it, so long as full disclosure is not otherwise legally "precluded."

When read in conjunction with MCPR 29–3, authorizing the regulations, and 30–1, *et seq.*, establishing the procedure for evidentiary hearings before the Board and authorizing the Board to take certain actions in conjunction therewith, it is clear that section 4.4 does not prevent any party or witness to a grievance from invoking a legal privilege or right the party has to maintain the confidentiality of documents or information. MCPR 29–3, which sets forth in general terms the essentials for the grievance procedure the CAO must establish, does not address exchange of information or documentation at any juncture.

MCPR 30–10, addressing the "Authorities and Duties" of the Board in presiding over hearings and appeals, states at subsection (b) that the Board is authorized "[t]o issue subpoenas for witnesses and documents. If privilege or confidentiality is claimed, the Board is authorized to apply to any court of competent jurisdiction for determination of the question...." Under MCPR 30–11, addressing "Prehearing Procedure," the

burden is on the parties, prior to the hearing, to disclose to one another the documents they intend to use at the hearing and to furnish the Board (or its designated hearing officer) the "names and addresses of witnesses and/or documents and records requiring service of a subpoena." Finally, under MCPR 30–15, at the discretion of the Board or a hearing officer appointed by it, interrogatories may be propounded and depositions may be taken. Document production is not mentioned in this regulation.

The interpretation the appellant advances for section 4.4 is unreasonable in its breadth. Essentially, it not only would require parties and witnesses to grievances to provide documents at the very outset of the grievance procedure, but also would require them to produce documents containing information protected by constitutional and common law privileges, so long as the privileges could be waived. Under the appellant's reading of section 4.4, for example, he would be required to produce to the appellee any document containing a communication by him to his attorney relevant to the grievance. He would no longer have the discretion to protect the document from production by invoking the attorney-client privilege.

Moreover, if, as the appellant argues, section 4.4 requires a party to a grievance to produce any relevant document unless *prohibited* from doing so, that administrative rule is at odds with, and cannot reasonably be harmonized with, the MCPR regulations we just have referenced—and under which section 4.4 was established. An evidentiary hearing before the Board will take place only after the internal grievance procedure established in Administrative Procedure 4–4 has taken place. The provisions of the MCPR authorizing the Board to file an action in court when issues of privilege and confidentiality are raised in response to the Board subpoenaing documents or witnesses will be inconsequential if the parties already will have been required to produce documents and witnesses, notwithstanding applicable privileges.

SG section 10–618(c)(1) afforded the appellee a statutory right to deny permission to inspect the testing/employment

documents the appellant sought. Even assuming those documents are of relevance to the appellant's grievance, and even assuming that section 4.4 requires production of relevant documents, section 4.4 does not require production of documents unless *prohibited* by law, regulation, or policy. Rather, it requires production of documents unless there is a legal or policy basis not to do so, *i.e.,* precluding production. SG section 10–618(c)(1) is a legal basis precluding production by the appellee of the documents in question, if the appellee exercises its discretion not to produce them. Accordingly, the Board correctly ruled that the appellee had the discretion to decline to provide the requested documents.

The appellant's argument on this issue challenges whether the appellee had any discretion to withhold the documents in question, not whether the Board properly ruled that the appellee did not abuse its discretion in declining to provide the documents. As we have noted, the documents in question clearly fell within the scope of SG section 10–618(c)(1). Moreover, there was evidence before the Board—which was uncontested—that the appellee's routine policy was to decline production of testing documents so as not to allow certain applicants an unfair advantage. In effect, the appellee's policy was commensurate with its right to decline inspection under the MPIA, and was followed for sound reasons that were not arbitrary. The Board properly decided that the appellee did not violate section 4.4 of Administrative Procedure 4–4 by declining to produce the documents at issue.

**JUDGMENT OF THE CIRCUIT COURT FOR MONT-GOMERY COUNTY VACATED, WITH INSTRUCTIONS TO VACATE THE DECISION OF THE MONTGOMERY COUNTY MERIT SYSTEM PROTECTION BOARD AND REMAND FOR A STEP III HEARING NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY MONTGOMERY COUNTY.**